UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

St. Jude Medical S.C., Inc., a
Minnesota corporation,

      Plaintiff and
      Counterclaim Defendant,

v.

                                  **MEMORANDUM OPINION**
                                        **AND ORDER**
                                Civil No. 11-327 (MJD/TNL)

Thomas M. Tormey, Jr.,

      Defendant and
      Counterclaim Plaintiff,

and

Tormedco, Inc.,

      Counterclaim Plaintiff.

_____

      Edward F. Fox, Carrie L. Hund and Peter L. Gregory, Bassford Remele, A
Professional Association, Counsel for Plaintiff/Counterclaim Defendant St. Jude
Medical S.C., Inc.

      Dwight G. Rabuse and Erin E. Neils, Rabuse Law Firm, P.A., Counsel for
Defendant and Counterclaim Plaintiffs Thomas M. Tormey, Jr. and Tormedco,
Inc.

_____

      This matter is before the Court on the Plaintiff's motion for judgment as a

matter of law pursuant to Fed. R. Civ. P. 50(b).

I.    **Background**

This case arises out of Thomas Tormey's relationship as a sales

representative for St. Jude Medical S.C., Inc. ("St. Jude").  On October 3, 2001,

Tormey and St. Jude entered into several written agreements: a Representative

Agreement, Loan Agreement/Promissory Note and Separate Letter Agreement.

Pursuant to the Representative Agreement, St. Jude agreed to pay a

guaranteed, aggregated salary of $1,860,000 over the first three years of a seven

year contract.  (Plaintiff Ex. 3.)  The Representative Agreement further set forth

Tormey's sales territory, commission rates and sales quotas, and provided that St.

Jude would hire a Technical Services Specialist ("TSS") "as soon as practicable"

to assist Tormey with his territory.  (Id. at TOR000035.)  Because Tormey was

subject to a one year, non-compete agreement arising from a prior business

relationship with Medtronic, quotas for Tormey's first year were set at zero.  (Id.

at TOR000030 and TOR000031.)  Quotas for the remaining years would be set by

St. Jude, in consultation with Tormey.  (Id.)

Pursuant to the Separate Letter Agreement, Tormey agreed to form a

corporation through which Tormey would conduct business.  (Plaintiff Ex. 2.)

Tormedco, Inc. ("Tormedco") is the entity that was formed for this purpose.

Once Tormedco was formed, the Representative Agreement was assigned to

Tormedco.  (Plaintiff Ex. 5.)  The Separate Letter Agreement also provided

Tormedco a put option to sell the corporation to St. Jude on October 3, 2006.

(Plaintiff Ex. 2 at SJM 00129.)  The put option was contingent on the

Representative Agreement being in force at that time. (Id.)

St. Jude also agreed to provide Tormey an interest free loan in the amount

of $650,000.  (Plaintiff Ex. 1.)  Pursuant to the Promissory Note, Tormey

personally agreed to repay the loan by October 3, 2008 or upon the sale of

Tormedco to St. Jude.  (Id. Ex. A.)  Pursuant to the Separate Letter Agreement, the

amount that Tormey would owe on the loan would be deducted from the

amount paid by St. Jude when the put option was exercised.  (Plaintiff Ex. 2 at

SJM 00130.)  The Loan Agreement further provided "This Loan Agreement and

the Note attached hereto may be amended, converted, or a right granted

pursuant to this Loan Agreement waived, only with the written consent of each

of the parties hereto."  (Plaintiff Ex. 1 at SJM 00196.)

Because of the Medtronic non-compete agreement, Tormey did not begin

to sell St. Jude's cardiac products until October 2002.  At about that time,

Tormey's wife was diagnosed with cancer.

In February 2003, Tormey inquired of St. Jude when it would hire a TSS to assist him in his sales territory, as provided for in the Representative Agreement. (Def. Ex. 45, 47 and 48.)  For the next few months, the parties had continued discussions about the hiring of a TSS.  Tormey insisted that St. Jude hire a TSS immediately, as one was needed for him to meet his sales quotas, while St. Jude took the position that a TSS would be hired when Tormey demonstrated a need for a TSS.  (Def. Ex. 48.)  In the spring and summer of 2003, the parties also had discussions concerning the setting of quotas.  Pursuant to the Representative Agreement, quotas were to be set by the eleventh month of the second year - or by September 3, 2003.  Tormey initially rejected the quotas proposed by St. Jude. In October 2003, the parties signed quota sheets for the period from October 2003 through September 2004. (Def. Ex. 59.)

On May 17, 2004, St. Jude notified Tormey by letter that St. Jude would terminate the Representative Agreement effective May 19, 2004 based on the fact that Tormey did not meet sales quotas from March 2003 through April 2004. (Plaintiff Ex. 13.)  Tormey maintains that following his termination, St. Jude's Vice President Jim Gantz proposed a walkaway deal where Tormey agreed not to pursue litigation against St. Jude and St. Jude would waive repayment of the

4

$650,000 loan issued to Tormey.  St. Jude denies that such an agreement was ever struck and maintains that Tormey remained obligated to repay the $650,000 loan.

After unsuccessful negotiations with Tormey, St. Jude filed suit in Minnesota state court against Tormey, seeking to recover $650,000 due under the Promissory Note, plus statutory interest.  The case was thereafter removed to federal court.

Tormey and Tormedco, Inc. (collectively referred to as "Tormey") asserted several counterclaims against St. Jude.  (Doc. No. 2.)  Tormey claims that he is not liable to repay the loan based on the theory that the several agreements executed in October 2001 formed a unitary agreement, and that St. Jude committed a material first breach which in turn was the material cause of Tormey not selling greater volumes of cardiac products.

The case was tried to a jury, and at the close of evidence, St. Jude moved for judgment as a matter of law, seeking dismissal of Tormey's counterclaims and the entry of judgment on its claim on the Promissory Note.  The motion was denied.  Tormey also moved for judgment as a matter of law on his claim that the parties entered into a unitary agreement made up of different, but related parts, that St. Jude breached that agreement, and that St. Jude's breach was a material

5

cause of Tormey not meeting his quotas.  That motion was also denied.

Ultimately, the jury was not able to reach a verdict and the Court declared

a mistrial.

## II.   Standard

Rule 50 (a)(1) of the Federal Rules of Civil Procedure provides:

> If a party has been fully heard on an issue during a jury trial and the court
> finds that a reasonable jury would not have a legally sufficient evidentiary
> basis to find for the party on that issue, the court may:
> (A) resolve the issue against the party; and
> (B) grant a motion for judgment as a matter of law against the party
> on a claim or defense that, under the controlling law, can be
> maintained or defeated only with a favorable finding on that issue.

"In applying this standard, [the court] must draw all reasonable inferences

in favor of the nonmoving party without making credibility assessments or

weighing the evidence." Arabian Agric. Servs. Co. v. Chief Indus., Inc., 309 F.3d

479, 482 (8th Cir. 2002) (internal quotation marks and citation omitted).  Rule

50(b) further provides that a party may renew a motion for judgment as a matter

of law after trial, and that upon such motion, the court may "(1) allow judgment

on the verdict, if the jury returned a verdict; (2) order a new trial; or (3) direct the

entry of judgment as a matter of law."

III.   **JMOL as to Oral Walkaway Agreement and Tolling the Statute of Limitations**

On February 9, 2011, Tormey filed his Answer and Counterclaims in this action, which included claims for declaratory relief and breach of contract.  In its first motion for summary judgment, St. Jude argued that Tormey's counterclaims should be dismissed as untimely.  The Court denied the motion, finding fact questions existed as to whether the applicable limitations period should be tolled based on Tormey's alleged reliance on the existence of an oral walkaway agreement.  The Court further found that fact questions existed as to whether an oral walkaway agreement was reached.

A.   **Trial Evidence Relevant to Walkaway Agreement**

At trial, Tormey testified that he sent an email to Ron Rolnick on April 27, 2004 which included proposals to modify or terminate his status as an independent sales representative for St. Jude.  (Doc. No. 223 (Tormey at 174-75); Def. Ex. 78.)  One proposal was that Tormey would walk away from his territory, the Tormedco buyout and the remaining years on his contract and that the no interest loan would be considered paid in full.  (Def. Ex. 78.)

Tormey further testified that when he received the May 17, 2004 termination letter, he initiated contact with James Gantz, as Gantz was the author of the termination letter.  (Doc. No. 223 (Tormey at 11).)  Tormey and Gantz spoke on the telephone for approximately seven or eight minutes, and that during this conversation, the Promissory Note was not discussed.  (Id. at 13.)  In fact, Tormey conceded no oral agreement was reached at that time by which St. Jude would forgive the $650,000 loan.  (Id. at 14.)

Following that conversation, Tormey sent Gantz an e-mail in which he wrote:

> I will forward your letter to my legal counsel as we discussed.  Please note, there was never an established quota set up in March 2003, as I did not agree to a quota until the third year per my contract . . . . I would like to present the facts to a member of SJM's senior management team before Ron and Mike begin to discuss this issue.

(Plaintiff Ex. 14.)  Gantz responded to his e-mail as follows:

> As discussed, I will have Bob Marchetti contact you regarding inventory.  I will also let Bob know that he should review all expense issues with you as well.  Finally, I would be happy to listen to any additional issues that you might have after my return from NASPE.  However, as you indicated, your lawyer has advised that he should be the one to talk to Ron moving forward.  This seems to make the most sense to resolve all remaining issues.

(Id.)

Tormey testified that approximately one week later, he again called Gantz to determine whether Gantz had spoken with Rolnick and that during this conversation, Gantz started talking about some of the proposals that Tormey had made in his April e-mail to Rolnick.  (Doc. No. 224 (Tormey at 184, 248).)  Tormey then proposed to Gantz that in exchange for not initiating legal action against St. Jude, St. Jude would forgive the $650,000 loan.  (Id. at 188, 251.) Tormey testified that at some point in this second conversation, "My understanding, what I heard from Mr. Gantz, was that in exchange for not initiating any legal action against St. Jude and the fact that if I would honor the non-compete, that the $650,000 loan would not have to be recouped."  (Id. at 251.)  Tormey admitted that no writing exists to confirm that such an agreement was reached.  (Id. at 252-53.)

At trial, James Gantz also testified regarding the conversation he had with Tormey on May 17, 2004, and it is Gantz's testimony that he had only one conversation with Tormey, that it took place on May 17, 2004, and that he did not make an oral agreement with Tormey to release or forgive the $650,000 loan. (Doc. No. 221 (Gantz at 66).)  Gantz further testified that while he does not recall the specifics of the conversation, he was confident that no such agreement was reached because he did not have the authority to make such an agreement, the

parties' lawyers would have addressed such an agreement, and it would have

been in writing.  (Id. 66-67.)  He further testified that he would never make such

an agreement, and not put it into writing.  (Id. at 67.)  Gantz also testified that

assuming such an agreement was reached, St. Jude would have to document the

loan forgiveness in its accounting, and that he had never seen any such

documentation which would indicate the loan had been forgiven.  (Id. 68-69.)

St. Jude also offered at trial letters sent to Tormey from St. Jude, on an

annual basis beginning in December 2001 through 2009, informing Tormey that

in accordance with IRS tax rules, St. Jude was required to impute interest on the

$650,000 loan, which in turn required Tormey to recognize such amount as

income in his personal tax returns. (Plaintiff Ex. 15.)  The letter further informed

Tormey that such amount would be included in a 1099 that would be distributed

to Tormey, and that Tormey would have to complete and attach a statement to

his tax return relating to the imputed interest.  (Id.; Plaintiff Ex. 16.)

At trial, Tormey acknowledged receiving these letters and the 1099s in a

Stipulation of Facts that was presented to the jury.  (Doc. No. 193 (Stipulation ¶¶

32-33).)  In addition, Tormey stipulated to the fact that in the years 2004-2006 and

2009, he reported income on his personal tax returns in amounts equal to that on

the 1099 forms sent to him by St. Jude.  (<u>Id.</u> ¶ 34.)  Tormey did not report any

amount of income from the discharge of the $650,000 loan.  (<u>Id.</u> ¶ 35.)

On October 30, 2008, St. Jude made formal demand for repayment on the

Promissory Note when it matured in October 2008.  (Plaintiff Ex. 37.)  Tormey

testified that after receiving this demand, he discussed the demand with his

attorneys.  (Doc. No. 223 (Tormey at 59-60).)  In a letter dated May 12, 2009 to

Tormey's attorney, counsel for St. Jude referenced discussions between them

concerning the October 30, 2008 demand for payment on the loan.  (Plaintiff Ex.

38.)  There is no mention in this letter of Tormey's belief that the loan had been

forgiven.  (<u>See</u> <u>id.</u>)  Tormey testified that in the context of receiving the October

2008, it became clear to him that the Note had not been forgiven.  (Doc. No. 223

(Tormey at 63).) Tormey acknowledged that the first time the issue of an oral

walkaway agreement was raised was in his counterclaims filed in February 2011.

(<u>Id.</u> at 65.)

**B.      Applicable Law Relevant to Tolling of Statute of Limitations**

In the Order denying St. Jude's first motion for summary judgment, the

Court held that Tormey's counterclaims for breach of contract were subject to the

limitations period set forth in the Representative Agreement, and that absent

application of estoppel or equitable tolling, the counterclaims would be barred as

untimely.  See Henning Nelson Const. Co. v. Fireman's Fund Am. Life Ins. Co.,

383 N.W.2d 645, 650 (Minn. 1986) (finding Minnesota law recognizes private

agreements which shorten the limitations period).  Accordingly, the limitations

period set forth in the Representative Agreement controls over the six year

limitations period set forth in Minn. Stat. § 541.05, subd. 1.

Here, the Representative Agreement specifically provided that the time to

bring an action for breach "shall be two (2) years from the date that the breach is

discovered, or four (4) years from the date of the breach, whichever is shorter."

Tormey does not seek to enforce an oral walkaway agreement.  (Doc. No.

234 (Opp. Brief at 18).)  Instead, he argues that he did not immediately assert his

claims for breach of contract because he reasonably relied on the belief that such

a walkaway agreement had been reached, and that as a result, the statute of

limitations for asserting his breach of contract counterclaims should be tolled.

Whether a party's reliance is reasonable is usually a matter for the jury to

determine, "unless the record reflects a complete failure of proof."  Hoyt Prop. v.

PRG, 736 N.W.2d 313, 321 (Minn. 2007).  See also, Nicollet Restoration, Inc. v.

City of St. Paul, 533 N.W.2d 845, 848 (Minn. 1995) (finding that where record is

devoid of any facts to support a conclusion that reliance was reasonable, there is

a complete failure of proof as to reasonable reliance); Rasmussen v. R & N

Dvorak, Inc., A07-0909, 2008 WL 1868314 at *4 (Minn. Ct. App. Apr. 29, 2008)

(finding it is proper for the court to determine reliance unreasonable as a matter

of law where there is no evidence to support conclusion that a party's reliance

was reasonable).

The only evidence presented at trial in support of Tormey's equitable

tolling claim is his testimony.  Gantz specifically testified that he did not make

such a promise and there is no evidence in the record of any writing

memorializing such a promise.  In addition, Tormey admitted that he received

letters and 1099s from 2004 through 2009 concerning imputed interest on the loan

- which are inconsistent with his belief that the loan was forgiven.

Even assuming that Gantz had proposed a walkaway agreement, by

October 2008, Tormey was on notice that St. Jude was not going to enforce such a

promise when St. Jude made a demand on the Note by letter dated October 30,

2008.  Tormey conceded at trial that when he received this letter, it became clear

that the Note had not been forgiven.  (Doc. No. 223 (Tormey at 63).)

The Court thus finds that as of October 30, 2008, no reasonable jury could

find that Tormey reasonably relied on the belief that St. Jude had forgiven the loan.  Accordingly, based on the limitations period set forth in the Representative Agreement, Tormey had to have asserted his claims for breach of contract two years from the date on which he had notice that St. Jude was seeking payment on the Note - or October 30, 2010.  Tormey did not assert his counterclaims, however, until February 9, 2011.  Tormey's counterclaims are thus time-barred, and St. Jude is entitled to judgment as a matter of law on those claims.

## IV.   JMOL as to Tormey's Claim of Unitary Agreement and Material First Breach

### A.   Unitary Agreement

St. Jude also moves for JMOL as to Tormey's claim that the Representative Agreement, the Loan Agreement/Promissory Note and Separate Letter Agreement should be considered a unitary agreement, such that breach of the Representative Agreement by St. Jude was the material cause of Tormey not reaching his quotas, and that he is thus excused from any and all obligations arising under the other agreements.  Tormey asserts that he is entitled to judgment on his claim that the above agreements formed one overall agreement.

Generally, instruments executed at the same time, by the same parties, relating to the same transaction will be considered and construed together,

14

since they are, in the eyes of the law, one contract or instrument.  Whether separate documents executed simultaneously should be treated as a single contract is governed by the intent of the parties manifested at the time of contracting and viewed in light of the surrounding circumstances.

Farrell v. Johnson, 442 N.W.2d 805, 806 (Minn. Ct. App. 1989) (internal citations omitted).

St. Jude asserts that each agreement, by its terms, should be considered separate and independent.  Each agreement relates to different obligations, and do not cross-reference the other with respect to a term or condition of either agreement.  The Promissory Note created a personal obligation upon Tormey, and Tormey - not Tormedco - was the only party to the Loan Agreement. (Plaintiff Ex. 1.)  The Representative Agreement contains an integration clause which makes it clear that the terms contained in that agreement express "the entire understanding of the parties with respect to its subject matter. . .  (Plaintiff Ex. 3.)  Tormedco was eventually substituted as the Representative under the Representative Agreement, thus there are different parties under the Note and the Representative Agreement.  St. Jude argues that as a matter of law, there cannot be a unitary agreement where the rights and obligations of the agreements pertain to different parties.  St. Jude further asserts that the only

agreement that references the Representative Agreement and the Note is the

Separate Letter Agreement - which was also referred to as the put option.

(Plaintiff Ex. 2.)  The put option was never exercised, however, therefore it did

not preclude termination of the Representative Agreement.

Tormey argues that there is evidence in the record which demonstrates

that the parties intended the agreements to be considered together.  St. Jude sent

Tormey a Letter of Intent, which begins "This letter is to confirm the intent of St.

Jude Medical S.C., Inc. ("SJMSC") and Thomas M. Tormey, Jr. . . . with respect to

the entering into of a Representative Agreement, a Separate Letter Agreement,

and a Loan Agreement, each dated as of September 24, 2001 . . ."  (Def. Ex. 3.)

The letter continues with a discussion as to the amount to be loaned Tormey

under the Loan Agreement, and that such amount was dependent on whether

Tormey could recoup $200,000 he contributed to a pension plan with Medtronic.

The letter concludes by requesting Tormey execute and return the letter to

acknowledge receipt and agreement to the terms of the undertaking.  (Id.)


Tormey asserts the Letter of Intent establishes the parties' intent to sign all

agreements, and that all agreements should be considered a single agreement.

Tormey testified that he would not have signed any one of the documents without signing the remaining documents, and that this deal could not have been concluded without the loan - the loan was essential because it helped compensate Tormey for the substantial amount of un-vested benefits he would lose by leaving Medtronic.

The Court finds there remains sufficient fact questions which render JMOL inappropriate on the question of whether the parties entered into a unitary agreement or several separate agreements.

## B.    Material First Breach

Under Minnesota law, a first breaching party cannot sue on the basis of the other party's subsequent breach where "the subsequent breach resulted directly from the initial breach." Carlson Real Estate Co. v. Solan, 549 N.W.2d 376, 379 (Minn. Ct. App. 1996) (citing MTS Co. v. Taiga Corp., 365 N.W.2d 321 (Minn. Ct. App. 1985) rev. denied (Minn. June 14, 1985)).  Tormey asserted a first breach defense in this case.  He claims that he is not obligated to repay the $650,000 loan because St. Jude first breached the Representative Agreement by not hiring a TSS to support Tormey "as soon as practicable."  Tormey further asserts that St.

Jude's breach was the direct cause of Tormey not being able to meet his monthly quotas.

Addendum D to the Representative Agreement includes the following provision: "SJMSC shall hire a Technical Services Specialist ("TSS") as soon as practicable, at no cost to REPRESENTATIVE, to support REPRESENTATIVE in REPRESENTATIVE'S territory."  (Plaintiff Ex. 3 (Addendum D ¶ 4).)  A TSS does not sell any devices.  Instead, they mainly assist the sales representatives with implants, or work in a pacemaker clinic and help the nurses and physicians with monitoring the pacemakers.  (Doc. No. 220 (Catlett at 13).)

It is St. Jude's position that it did not breach the Representative Agreement by not immediately assigning a TSS in Tormey's territory, as the need for a TSS was tied to Tormey performing at the high level he purportedly delivered in the year prior to leaving Medtronic, and that Tormey never reached that level.

St. Jude asserts that the record shows that a seasoned sales representative could easily achieve the quotas set for Tormey in 2003 without TSS support; which ranged from 12 to 15 pacemakers and 2 to 4 defibrillators per month. (Doc. No. 221 (Gantz at 55-57); Doc. No. 220 (Catlett at 19-20).)  In fact, Tormey

testified that his personal record for pacemakers was seven implants in one day.

(Doc. No. 224 (Tormey at 211).)  The record also demonstrates that there was

always adequate TSS support in Tormey's territory consistent with his level of

performance.  (Doc. No. 221 (Gantz at 35-37); Doc. No. 220 (Catlett at 21).)  St.

Jude did eventually provide Tormey a dedicated TSS, Bill Waller, in October

2003.  (Plaintiff Exs. 30 and 31.)  Waller was a qualified and experienced TSS who

was familiar with St. Jude technology and the accounts in Tormey's territory.

(Id.; Doc. No. 220 (Catlett at 32.)  Waller sent Tormey an email on October 27,

2003, stating that he was looking forward to working with Tormey and that "I am

available 24/7 for implants and follow-ups and I am familiar with most of your

customers." (Def. Ex. 64.)  He further provided Tormey all telephone numbers at

which he could be reached, and invited Tormey to call him at home any time.

(Id.)  Finally, the record demonstrates that Tormey temporarily waived any

requirement for a TSS in exchange for modest sales levels and revenue targets as

set forth in the October 2003 quotas.  (Plaintiff Exs. 10, 11, 27 and 28; Doc. No. 223

(Tormey at 41-44.))  In an email sent September 17, 2003, Tormey suggested that

until the issues concerning the hiring of a TSS, monthly sales reports and the

splitting of accounts was resolved, minimum sales quotas be set at levels he

proposed.  (Plaintiff Ex. 11.)  For example, for the month of October 2003, Tormey

proposed quotas which required him to sell 12 pacemakers and 2 defibrillators.

(Plaintiff Ex. 12.)  St. Jude thereafter agreed to the quotas included in Tormey's

email.  (Tormey Tr. At 243-444; Plaintiff Exs. 10, 11, 27; Tormey Tr. at 149.)

Tormey responds that the Representative Agreement provided that he

would be assigned a TSS "as soon as practicable" and based on the trial record, a

jury could find that St. Jude breached this term.  Tormey asserts there was

nothing in the contract that required him to "earn" the right to TSS support.

While at Medtronic, Tormey sold extraordinary volumes of the same cardiac

products to the same customer set, and was able to do so because Medtronic

provided him the necessary support.  He asserts that he needed TSS support

right away because his sales strategy at St. Jude was to be based on the team

support approach - such as he had at Medtronic.  He further claims that his

customers expected this team approach and his sales were severely impacted by

not having such support through a TSS.  (Doc. No. 223 (Tormey at 98, 111-12, 119,

123, 140, 160.)  In light of the evidence of his success at Medtronic, Tormey argues

a jury could reasonably find that St. Jude committed a material breach by not hiring a TSS right away.

Tormey further asserts that his September 17, 2003 email does not establish a waiver of the TSS requirement.  The email contained a list of St. Jude's ongoing breaches, and Tormey's suggestion to set aside the determination of quotas until other issues were resolved was never responded to by St. Jude.  After several weeks, quota sheets were ultimately signed, but Tormey signed them under the proviso that quotas were not agreed to by September 1 per the Representative Agreement.  (Def. Ex. 60.)  Further, Tormey argues that St. Jude did not treat the TSS requirement as waived, given the fact that it assigned Bill Waller to his territory.  Tormey also argues that the waiver agreement is inconsistent with St. Jude's overarching position that the Representative Agreement could only be modified through writing.  He argues the waiver argument works in his favor, given his testimony that he was willing to agree to certain quota levels because at the time, he believed that his wife was still in relatively good health.  Soon thereafter, however, his wife took a turn for the worse, which required Tormey to spend more time away from work.

Finally, Tormey argues that at trial, St. Jude asserted that the Representative Agreement was terminated based on Tormey's failure to meet quotas from November 2003 through April 2004.  However, the May 17, 2004 termination letter refers to the fact that he had not met quotas from March 2003 through the date of his termination.  (Def. Ex. 81.)  Tormey argues that St. Jude's "shifting sands" justification for terminating the Representative Agreement could be seen as pretextual by the jury.  Further, Tormey argues that during November 2003 through his termination, Tormey's life was in turmoil - his wife was dying, and St. Jude responded by relieving Tormey of his quota obligations during those months, yet the Representative Agreement was terminated for not meeting those quota obligations.

With respect to Tormey's argument about his wife's illness, the Court instructed the jury that such evidence "does not limit St. Jude Medical's right to terminate the Representative Agreement, does not excuse Thomas Tormey's performance of the Representative Agreement and Loan Agreement and Promissory Note and cannot give rise to a counterclaim against St. Jude Medical."  (Doc. No. 206 (Jury Instruction No. 20).)  Accordingly, such argument

and evidence is not relevant to the issue of whether St. Jude breached the

Representative Agreement.

The evidence at trial relevant to this issue demonstrates that the monthly

quotas set for Tormey at St. Jude during all of 2003 and 2004 were significantly

below those quotas Tormey included in his Pro Forma prepared in 2001, which

was based on his team sales at Medtronic.  For example, quotas set at St. Jude

provided that Tormey would sell 12 pacemakers in October 2003.  (Plaintiff Ex.

12)  The Pro Forma, however, Tormey provided that he would sell 66 pacemakers

per month. (Plaintiff Ex. 53.)  At trial, Tormey conceded it was possible that a

quota level of 12 or 14 pacemakers per month was a level that he could easily

meet without TSS support.  (Doc. No. 224 (Tormey at 210-11).)   The evidence also

demonstrates that Tormey himself proposed minimal quotas to take effect

November 1, 2003 and that he set the quota levels based on the fact that the TSS

issue had not yet been resolved.  Specifically, in the email, Tormey wrote "Any

minimum sales quota has to address the following:  1.  No TSS support as

promised . . .  Therefore, I suggest that until the above issues are resolved, we set

the minimum sales quotas [as set forth below]."  (Plaintiff Ex. 11.)

St. Jude agreed to the minimal quotas included in this email.  (Plaintiff Ex.

10.)  Further, Tormey was assigned a dedicated and experienced TSS in October

2003.  Taken together, the evidence demonstrates that Tormey did agree to

certain minimal quotas in October 2003, with the knowledge that such quotas

would have to be met without the assistance of a TSS.  But despite the fact that he

was assigned a TSS that same month, he was unable to meet the quotas set for

October 2003 through the date of termination.

Viewing the evidence in the light most favorable to Tormey, the Court

finds that no reasonable jury could find that St. Jude's failure to provide Tormey

dedicated TSS earlier than October 2003 was the direct cause of Tormey not being

able meet his quotas in 2003 through 2004.  St. Jude is thus entitled to judgment

as a matter of law as to Tormey's defense of material first breach.

**IT IS HEREBY ORDERED** that:

1. Plaintiff St. Jude Medical S.C., Inc.'s Motion for Judgment as a Matter

   of Law [Doc. No. 226] is **GRANTED**; and

2. Defendant Tormey is liable to St. Jude for repayment of the

Promissory Note in the principal amount of $650,000.00, plus

statutory interest in the amount of $192,543.70 through September 9,

2013, with interest accruing thereafter until the date of entry of

judgment pursuant to this Order at the rate of $106.85 per diem.

**LET JUDGMENT BE ENTERED ACCORDINGLY**.

Dated:   February 10, 2014

s/ Michael J. Davis
Michael J. Davis
Chief Judge
United States District Court
